1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   BRIAN KEITH MONTGOMERY,

11            Petitioner,                    2:  08 - cv - 3180 TJB

12        vs.

13   D.K. SISTO,                             ORDER, FINDINGS AND

14                                           RECOMMENDATIONS

15            Respondent.

16   _____/

17                         I.  INTRODUCTION

18         Petitioner, Brian Keith Montgomery, is a state prisoner proceeding *pro se* with a petition

19   for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a sentence

20   of life with the possibility of parole plus eight years of enhancements for attempted murder.

21   Petitioner challenges the October 2007 decision by the Board of Parole Hearings (the "Board")

22   denying Petitioner parole.  Petitioner argues that he was denied his due process rights when the

23   Board arbitrarily and capriciously found him unsuitable for parole.  For the foregoing reasons, the

24   petition should be denied.

25

26

                                           1

## II. FACTUAL[1] AND PROCEDURAL BACKGROUND

On the afternoon of December 4th, 1990, the defendant was driving a black 1976 Dodge Charger containing a propane stove, a box of glassware and a large bag of unfinished methamphetamine. He went to the homes of two friends and asked permission to complete the process of manufacturing methamphetamine. They each deny permission to do so. Defendant left about 5:00 or 5:30 p.m. About 6:00 p.m., El Dorado County Sheriff's Deputy, Robert Pepper, was on patrol in the Summerset area in a marked car. On Highway East 16, he saw a black Dodge traveling at high speed. Pepper attempted to stop the car for excessive speed by activating his overhead strobe light. The Dodge slowed to about 20 miles per hour and although it could've stopped safely, the Dodge entered a store parking lot, slowed to 5 miles per hour, drove onto an adjourning street, continued about 100 feet, turned into another parking lot, drove 75 feet and stopped.

Pepper stopped and approached the defendant, the driver, who sat with his hands out of view near the seat. Pepper briefly moved the beam of his flashlight through the car and seen only the defendant and concluded he was alone in the car. Defendant said, "Good evening, officer" and Pepper asked him to put his hands on the steering wheel. Defendant's right arm moved and Pepper saw a very faint muzzle flash coming from the driver's area of the vehicle and heard eight or nine reports of a .22 semi-automatic long rifle coming in split-second succession from the area of the vehicle. Pepper took cover behind his patrol car and returned fire, observing defendant's car door was open slightly. Defendant's car sped off. Pepper, who wore a bullet-proof vest, suffered nine bullet wounds to the chest, shoulder, side, abdomen, and back, and underwent two surgeries as a result."

"The Charger passed a woman who had been shopping nearby. She looked directly into the Charger, which was no more than 15 feet away, and saw there was no one in the passenger seat. Others witnessed at least portions of the occurrence, but could not identify the assailant. About 9:10 p.m., defendant telephoned his long-time friend, Lisa Thomason-Downs, said there was an emergency and asked her to pick him up near Summerset. She complied and found the defendant very scared, nervous and upset. Defendant said she would not like him anymore because he shot someone. He didn't know who he shot, but it was someone who walked up to his window with a red light. Defendant also said there was 2 pounds of methamphetamine and equipment for cooking methamphetamine in the car, and he hid the car and the gun he

---

[1] The factual background of the commitment offense is taken from the appellate court ruling which was read into the record during Petitioner's October 2007 parole suitability hearing. Petitioner attached a copy of the transcript of that hearing to his petition.

used.  Defendant said nothing about anyone being with him or about a man name Tex.  As she dropped him off, defendant asked her not to tell anyone she had picked him up.  Defendant later asked for and received rides from two other friends.  He told each of them a man name Tex rode with him when they were stopped by a policeman and Tex shot the policeman.  He told one of them that he and Tex left the scene separately and he ditched the car in a remote area, but did not know what happened to Tex, the methamphetamine or the gun.  Defendant denied knowing where the rifle came from."

When arrested the morning after the offense, the defendant had in his possession, among other things, about 30 rounds of live .22 caliber ammunition, a plastic bindle of white powder and a piece of laboratory glassware.  Police found the Charger abandoned near a dirt road in a densely wooded area a mile or two from the scene of the offense.  The Charger was riddle with bullet holes and contained three expended .22 caliber shells, a freon refrigerator can, an empty .22 caliber ammunition box, a small plastic bag of ephedrine (they have that down as a precursor of methamphetamine), a three-burner stove, and a vial of orange powder containing methamphetamine, ephedrine and caffeine.  Nearby was a box of glassware commonly associated with the manufacture of methamphetamine, ephedrine and caffeine.  Defendant's fingerprints were found throughout the car, on the freon container and on various pieces of the glassware.  Ten usable, but unidentifiable fingerprints of persons other than defendant, were Derrick "Tex" Readance, were also found on the car.  Defendant told police he and Tex Readance, or Resdance, from West Sacramento got together the afternoon of the offense, but no one saw them together.  Defendant said he drove the Charger and Tex rode in the passenger seat.  Defendant saw a red light and became frightened because he had outstanding warrants.  Tex said, "Don't worry about it."  They stopped, the policeman approached and Tex grabbed the defendant's .22 caliber rifle and began shooting.  The officer returned fire and the defendant drove away, and hid the car.  Defendant eventually admitted hiding the rifle, but later said Tex probably had it.  He denied owning the glassware, but admitted using methamphetamine the day of the offense."

"While he was in jail, the defendant showed a visitor a map with an "X" on it, made a hand gesture resembling a gun and said "X marks the spot.  It would be there in a bush and go there and pick it up."  Defendant said to keep it at her house because police would not search there.  Under a bush at the location indicated on the map, police found the .22 caliber semi-automatic rifle used by Pepper's assailant."

(Pet'r's Pet. at p. 83-88.)

In October 2007, the Board conducted a subsequent parole consideration hearing.  The

3

1    Board ultimately concluded that Petitioner was not suitable for parole as he would pose an

2    unreasonable risk of danger to society or a threat to public safety if released from prison.

3    Petitioner challenged the Board's decision in the County of El Dorado Superior Court via a state

4    habeas petition.  On March 7, 2008, the Superior Court denied the state habeas petition in a

5    written opinion.  The California Court of Appeal, Third Appellate District summarily denied the

6    state habeas petition on April 24, 2008.  The California Supreme Court summarily denied the

7    state habeas petition on June 25, 2008.  In July 2008, Petitioner filed the instant federal habeas

8    petition.

9              III.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

10              An application for writ of habeas corpus by a person in custody under judgment of a state

11   court can only be granted for violations of the Constitution or laws of the United States.  See 28

12   U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v.

13   Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

14   Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

15   and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

16   320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

17   decided on the merits in the state court proceedings unless the state court's adjudication of the

18   claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

19   clearly established federal law, as determined by the Supreme Court of the United States; or (2)

20   resulted in a decision that was based on an unreasonable determination of the facts in light of the

21   evidence presented in state court.  See 28 U.S.C. 2254(d).

22              As a threshold matter, this Court must "first decide what constitutes 'clearly established

23   Federal law, as determined by the Supreme Court of the United States.'"  Lockyer v. Andrade,

24   538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law'

25   under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court

26   at the time the state court renders its decision.'"  Id. (citations omitted).  Under the unreasonable

4

1  application clause, a federal habeas court making the unreasonable application inquiry should ask

2  whether the state court's application of clearly established federal law was "objectively

3  unreasonable." See Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may

4  not issue the writ simply because the court concludes in its independent judgment that the

5  relevant state court decision applied clearly established federal law erroneously or incorrectly.

6  Rather, that application must also be unreasonable." Id. at 411.  Although only Supreme Court

7  law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in

8  determining whether a state court decision is an objectively unreasonable application of clearly

9  established federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only

10 the Supreme Court's precedents are binding . . . and only those precedents need be reasonably

11 applied, we may look for guidance to circuit precedents.").

12      The first step in applying AEDPA's standards is to "identify the state court decision that

13 is appropriate for our review."  See Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).

14 When more than one court adjudicated Petitioner's claims, a federal habeas court analyzes the

15 last reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).  In this case,

16 the last reasoned decision came from the County of El Dorado Superior Court.

17                          IV.  PETITIONER'S CLAIM FOR REVIEW

18      Petitioner argues that the Board acted arbitrarily and capriciously in denying his parole in

19 2007 and that the denial amounts to a denial of his due process rights.  The Due Process Clause

20 of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or

21 property without due process of law.  A person alleging a due process violation must first

22 demonstrate that he or she was deprived of a protected liberty or property interest, and then show

23 that the procedures attendant upon the deprivation were not constitutionally sufficient.  See Ky.

24 Dep't of Corr. v. Thompson, 490 U.S. 454, 459-60 (1989).

25      A protected liberty interest may arise either from the Due Process Clause itself or from

26 state laws.  See, e.g., Bd. of Pardons v. Allen, 482 U.S. 369, 373 (1987).  The United States

                                          5

Constitution does not, in and of itself, create a protected liberty interest in the receipt of a parole date.  See Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).  However, if a state's statutory parole scheme uses mandatory language, it "'creates a presumption that parole release will be granted' when or unless certain designated findings are made, and thereby giving rise to a constitutional liberty interest."  McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002) (quoting Greenholtz v. Inmates of Neb. Penal and Corr. Complex, 442 U.S. 1, 12 (1979)).

The full panoply of rights afforded a defendant in a criminal proceeding is not constitutionally mandated in the context of a parole proceeding.  See Pedro v. Or. Parole Bd., 825 F.2d 1396, 1398-99 (9th Cir. 1987).  The Supreme Court has held that a parole board's procedures are constitutionally adequate if the inmate is given an opportunity to be heard and a decision informing him of the reasons he did not qualify for parole.  See Greenholtz, 442 U.S. at 16.

As a matter of state law, denial of parole to California inmates must be supported by at least "some evidence" demonstrating current dangerousness.  See Hayward v. Marshall, 603 F.3d 546, 562-63 (9th Cir. 2010) (en banc) (citations omitted).  "California's 'some evidence' requirement is a component of the liberty interest created by the parole system of the state." Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010).  Thus, a reviewing court such as this one must "decide whether the California judicial decision approving the governor's decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement or was it 'based on an unreasonable determination of the facts in light of the evidence.'"[2]  Hayward, 603 F.3d at 562-63.

_____

[2] To the extent that the Respondent argues that Petitioner's Claims are not cognizable on federal habeas review under AEDPA or that Petitioner does not have a federally protected interest in parole, the Ninth Circuit has specifically held that "due process challenges to California courts' application of the 'some evidence' requirement are cognizable on federal habeas review under AEDPA," and that "California's 'some evidence' requirement is a component of the liberty interest created by the parole system of that state."  Cooke, 606 F.3d at 1213 (citing Hayward, 603 F.3d at 561-64).

1       The analysis of whether some evidence supports denial of parole to a California state

2   inmate is framed by the state's statutes and regulations governing parole suitability

3   determinations.  See Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007), overruled in part on other

4   grounds, Hayward, 603 F.3d 546.  This court "must look to California law to determine the

5   findings that are necessary to deem a prisoner unsuitable for parole, and then must review the

6   record to determine whether the state court decision holding that these findings were supported

7   by 'some evidence' . . . constituted an unreasonable application of the 'some evidence'

8   principle."  Id.

9       California Penal Code section 3041 sets forth the state's legislative standards for

10  determining parole for life-sentenced prisoners.  Section 3041(a) provides that, ""[o]ne year prior

11  to the inmate's minimum eligible release date a panel . . .  shall again meet with the inmate and

12  shall normally set a parole release date."  Cal. Penal Code § 3041(a).  However, subsection (b)

13  states an exception to the regular and early setting of a life-sentenced prisoner's term, if the

14  Board determines "that the gravity of the current convicted offense or offenses, or the timing and

15  gravity of current or past convicted offense or offenses, is such that the consideration of public

16  safety requires a more lengthy period of incarceration for this individual."  Cal. Penal Code §

17  3041(b).

18      Title 15, Section 2402 of the California Code of Regulations sets for various factors to be

19  considered by the Board in its parole suitability findings for certain types of attempted murders.

20  "The regulation is designed to guide the Board's assessment of whether the inmate poses 'an

21  unreasonable risk of danger to society if released from prison,' and thus whether he or she is

22  suitable for parole."  In re Lawrence, 44 Cal. 4th at 1214, 82 Cal. Rptr. 3d 169, 190 P.3d 535.

23  The Board is directed to consider all relevant, reliable information available regarding:

24          the circumstances of the prisoner's social history; past and present
            mental state; past criminal history, including involvement in other
25          criminal misconduct which is reliably documented; the base and
            other commitment offenses, including behavior before, during and
26          after the crime; past and present attitude toward the crime; any

7

conditions of treatment or control, including the use of special
conditions under which the prisoner may safely be released to the
community; and any other information which bears on the
prisoner's suitability for release.

15 Cal. Code Regs. § 2402(b).  The regulation also lists several specific circumstances which

tend to show suitability or unsuitability for parole.  Id. § 2402(c)-(d).[3]  The overriding concern is

---

[3] Circumstances tending to indicate unsuitability include:

> (1) Commitment Offense.  The prisoner committed the offense in an especially
> heinous,  atrocious or cruel manner.  The factors to be considered include:
>> (A) Multiple victims were attacked, injured or killed in the same or
>> separate incidents.
>> (B) The offense was carried out in a dispassionate and calculated manner,
>> such as an execution style murder.
>> (C) The victim was abused, defiled or mutilated during or after the
>> offense.
>> (D) The offense was carried out in a manner which demonstrates an
>> exceptionally callous disregard for human suffering.
>> (E) The motive for the crime is inexplicable or very trivial in relation to
>> the offense.
> (2) Previous Record of Violence.  The prisoner on previous occasions inflicted or
> attempted to inflict serious injury on a victim, particularly if the prisoner
> demonstrated serious assaultive behavior at an early age.
> (3) Unstable social history.  The prisoner has a history of unstable or tumultuous
> relationships with others.
> (4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted
> another in a manner calculated to inflict unusual pain or fear upon the victim.
> (5) Psychological Factors.  The prisoner has a lengthy history of severe mental
> problems related to the offense.
> (6) Institutional Behavior.  The prisoner has engaged in serious misconduct in
> prison or jail.

15 Cal. Code Regs. § 2402(c).

Circumstances tending to indicate suitability include:

> (1) No Juvenile Record.  The prisoner does not have a record of assaulting others
> as a juvenile or committing crimes with a potential of personal harm to victims.
> (2) Stable Social History.  The prisoner has experienced reasonably stable
> relationships with others.
> (3) Signs of Remorse.  The prisoner performed acts which tend to indicate the
> presence of remorse, such as attempting to repair the damage, seeking help for or
> relieving the suffering of the victim, or indicating that he understands the nature
> and magnitude of the offense.
> (4) Motivation for Crime.  The prisoner committed his crime as the result of

public safety and the focus is on the inmate's *current* dangerousness.  See In re Lawrence, 44

Cal. 4th at 1205, 82 Cal. Rptr. 3d 169, 190 P.3d 535.  Thus, the proper articulation of the

standard of review is not whether some evidence supports the reasons cited for denying parole,

but whether some evidence indicates that the inmate's release would unreasonably endanger

public safety.  See In re Shaputis, 44 Cal. 4th at 1254, 82 Cal. Rptr. 3d 213, 190 P.3d 573.  There

must be a nexus between the facts relied upon and the ultimate conclusion that the prisoner

continues to be a threat to public safety.  See In re Lawrence, 44 Cal. 4th at 1227, 82 Cal. Rptr.

3d 169, 190 P.3d 535.  As to the circumstances of the commitment offense, the Lawrence court

concluded that while:

> the Board and the Governor may rely upon the aggravated
> circumstances of the commitment offense as a basis for a decision
> denying parole, the aggravated nature of the crime does not in and
> of itself provide some evidence of current dangerousness to the
> public unless the record also establishes that something in the
> prisoner's pre- or post-incarceration history, or his current
> demeanor or mental state, indicates that the implications regarding
> the prisoner's dangerousness that derive from his or her
> commission of the commitment offense remain probative to the
> statutory determination of a continuing threat to public safety.

Id. at 1214, 82 Cal. Rptr. 3d 169, 190 P.3d 535.

A. 2007 Board Decision

On October 1, 2007, the Board denied Petitioner parole.  It stated the following in issuing

significant stress in his life, especially if the stress has built over a long period of
time.
(5) Battered Woman Syndrome.  At the time of the commission of the crime, the
prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b),
and it appears the criminal behavior was the result of that victimization.
(6) Lack of Criminal History.  The prisoner lacks any significant history of violent
crime.
(7) Age.  The prisoner's present age reduces the probability of recidivism.
(8) Understanding and Plans for Future.  The prisoner has made realistic plans for
release or has developed marketable skills that can be put to use upon release.
(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to
function within the law upon release.

Id. § 2402(d).

its denial:

> [T]his Panel's reviewed all of the information received and we've relied on the following circumstances in concluding that you are not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.  You know, I have to tell you, you presented very well today and even with a sore throat or damaged vocal cords, you did a good job . . . [W]e have a couple of issues that we wanna go through with you and we'll spell out some of our recommendations to you.  We are giving you a one-year denial and, you know, you received a one-year denial last time and you didn't have any 115s, though we still gave you a one-year denial anyway this time because of your programming.  I think the other thing that touched me as well is I believe you are sincerely remorseful and, to be honest with you, I don't think we get to see that as much as we would like to see.  We see people play at being remorseful and play at being sad.  Um, the problem is, you know, you just royally screwed up early on and your total lose of control, personal dignity, self-concept, whatever you wanna call it destroyed a man.  A man that's still living, but his whole life, his whole being.  Who knows that you have left him to carry for the rest of his life.  And there's a couple of things before I go into this I'd like to say.

> You said you were a little boy at the time of this commitment offense and I'm gonna disagree with you.  You were a 24-year-old man that made the choices that got you where you were at that time.  You did it.  Nobody did it for you.  And, uh, you know, I say this to a lot of folks.  There's a lot of people out there that do drugs, that drink, but they don't kill people, and those are things that we have to take into consideration.  I would also indicate that yes, in fact, just to confirm your attorney's concern, you did serve, uh, your determinant sentence prior to starting your life sentence.  Your life sentence, you've served here for 12 years and that's what we look at.  So you've done 12 years behind your commitment offense.  So, with that being said, I'm gonna go through this decision with you.  That's for you to keep sir.  Try to give you some ideas and go from there.  When we go through this decision, I always incorporate the commitment offense, yes, because that's what brought you here an the commitment offense was awful.  Um, I referred to the Appellate ruling for the statement of facts that was filed on September 16th, 1992, and reviewed and entered in the record pages 2 through 6.

> The bottom line here is that you had spent a number of years under the influence.  You had been bounced around, according – in your mind – I don't think you formed a great deal of personal connections with anybody at that time.  You got involved in drugs at the age of 17, using methamphetamine, drinking to excess when you did drink, experimenting with marijuana.  Your prior record is deplorable, which we'll get into a moment.  You're out speeding

1   around in a mountain community, and a police officer stops you.
    You have a gun or a rifle in your car.  You have drug
2   paraphernalia, chemicals to make meth, and you shot a police
    officer nine times.  Fortunately, Mr. Pepper survived because he
3   was wearing his bulletproof vest.

4   I read your description or your version into the record.  It left me
    with some questions maybe you might wanna think about
5   answering for the next Panel.  I'm not clear how you feel about law
    enforcement now.  I'm not clear how you gained the insight to
6   grow from that point at the age of 24 to the point you're at 41.  I'd
    like to see you be able to explain some of that transitioning process
7   of how you got there.  How am I gonna know that if you get a date
    someday that you're not gonna regress or digress and go back to
8   being disenchanted or disrespectful of law enforcement because of
    prior history.  I think you need to be able to spell that out a little bit
9   better.

10  This commitment offense was carried out in a cruel and callous
    manner.  Fortunately, nobody else was hurt.  I do believe that in
11  your mind, somehow you managed to get Officer Pepper off, away,
    but nine shots still, I'm still kinda dealing with that, too.  The
12  offense was carried out in a calculated manner.  You know, I don't,
    I can't call it an execution style murder because it wasn't like you
13  were sitting there lying in wait, but you did get stopped. . . .
    I mean, I'm sorry.  Attempted murder.  So, um, also the offense
14  carried out in a manner which demonstrates disregard for human
    suffering.  Your version, you need to re-do again and read, and re-
15  do it again for your next hearing.  Um, think you need to take a
    look at it . . . . I would write it based upon where you're at now.
16  This was many years ago and it still, in my mind, like you still had
    a whole bunch of hang up about law enforcement . . . .

17
    Take it as a suggestion or not.  Um, the motive for the crime is
18  inexplicable.  The only motive we can come up with is exactly
    what was said already:  You didn't wanna get arrested again.  You
19  didn't wanna serve jail time again and, I guess in your mind, this
    was the easiest way of dealing with it.  Your prior record, we went
20  through.  It's all about some petty burglaries.  A lot of drug stuff.
    You were given many, many opportunities to get away from the
21  drugs and that still is a concern to this Panel as well.  You've been
    on probation for drugs.  You were offered going to a program to
22  help you stay away from drugs and you chose not to do that.  Uh,
    nothing serious as a juvenile.  You had weapons.  Weapons and
23  drugs don't go together real well.  We never knew why you had the
    rifle in your vehicle because we didn't discuss the commitment
24  offense.  You also have a prior for fighting with your sister and that
    went all the way to a battery charge.  So, you have a record of
25  violence and some assaultive behavior, a history of unstable
    relationships, an escalating pattern of criminal conduct, and you
26  failed previous grants of probation.  There's been intervention

1   attempts through the courts, through the jail, adult probation, and
    you were offered the opportunity to get through a drug diversion
2   program and chose not to do it.  So, ya got a whole lot of stuff
    workin' against you.
3
4   Then we come to the institution and we start seeing some
    improvement.  You have a classification score if 19.  That's the
5   lowest you can get, so that's good.  With regard to your
    disciplinaries, that 115 in February is doin' a lot of damage.  I'm
6   being perfectly frank about it.  A 115 is a 115, and tat
    means you followed the rules [sic].  Now, I know that that issue is
7   in court.  The point being, right now it's on your record and we
    know that it's there, and we take a look at it, and it's doing you
8   damage.  I'll be perfectly frank.  Even though, you know, I went
    back and read it and there's an indication that this was supposed to
9   be a joke.  If you're not supposed to have cigarettes and you're
    supposed ot follow the rules, and you've been doing so
10  tremendously well, why would you even think about jeopardizing
    yourself, joke or no joke?  A life sentence is not a joke.  And I
11  don't know where that 115's gonna go for you, but right now it's
    doing you some damage . . . Especially since you didn't have
12  anything before that.  So, I hope, for your sake, that it comes out
    okay in court for you.  You have two 128s; the last one in October
13  of '94, so other than this one stupid 115, you got a great
    disciplinary record.  You received your GED in January of '95.
14  You've got a couple of vocations; Masonry in '99, Lens Lab in
    2000, and you got your ABO there in 02/02, Eyewear Vocation in
15  '01.  So, you've got good work experiences for the first time in
    your life and we could tell that that made you feel very proud.
16  Self-help, you've been involved in, it looks like, for a number of
    years.  The only times you haven't been involved is when the
17  institution didn't afford you the opportunity to be involved, so it
    looks like at least nine years, if not longer, fairly consistently.  Um,
18  you have been involved in some-self help, Tobacco Cessation,
    which is kind of ironic considering your 115, but.  PIA Optical,
19  Lead Man.  You got a chrono for it.  You've participated in the 40
    Days of Purpose in '07, Creative Conflict Resolution in '05.  We
20  saw your certificates for the Phases Program and I was very
    impressed that you did complete the two book reports, the one with
21  Taming the Gremlins and the one on Tattoos, and you didn't even
    look at those reports because you remembered how they impacted
22  you.  Continue to do some of those.  I think it would be good for
    you.
23  Um, Dr. Rouse, did a psychiatric or psychological evaluation on
    you in January of '07.  Gave you an Axis I diagnosis of
24  Polysubstance Dependence, in sustained institutional remission and
    a GAF score of 90.  Now, GAF means Global Assessment of
25  Functioning.  It's how he thinks you would be in the community as
    long as you stayed drug free.  90's a good grade.  It's like an A- if
26  you're gonna look at in the grade world.  It's a good, solid grade

1   for you.  He also indicated that you were low risk for violence in
    the community.  I think all of this is predicated on the fact tat you
2   cannot go back to drugs or alcohol ever.  You know what a poison
    it is to you . . . .

3
    Uh, parole plans.  You've got a good support system.  I think we're
4   concerned about you going back to where the victim lives.
    Placerville's not a very big community, and, uh, you're gonna need
5   to shore up your parole plans.  Make 'em stronger.  You need
    letters for employment.  Since you have a job offer, get a letter.
6   Make sure the letter says where your work would be, what you
    would, be doing, you know, how many house, how much money
7   you would be making.  I think it's a good idea for you to have
    alternative plans.  You don't wanna put all your eggs in one basket.

8
    The other thing I'm just gonna throw out there for a thought,
9   because of your background, is you might wanna think about
    transitional housing in some fashion, as well.  A lot of drug and
10  alcohol programs out there that don't charge.  They're like six-
    month programs where they help you transition into the
11  community.  They are a support system 24/7.  You know, I'm
    concerned about some of your options being your family, as strong
12  as they are for you, it's the family you came from that caused you
    some grief.  Like your uncles, and stuff, I'd hate to see you be put
13  in the middle of all of that, having to be making some tough
    decisions with regards to family members.  Just a thought.
14  I mentioned to you the 3042 notices that went out.  Obviously, we
    have the District Attorney's office from El Dorado County
15  represented today, as well as the sheriff's department, and both
    were in opposition to your parole at this time.
16
    So, just briefly in summary, you need to stay away from the
17  disciplinaries, continue your self-help as much as you possibly can.
    Take anything and everything.  I would suggest taking a look at
18  getting a sponsor in the outside world too.  You've got your AA
    meeting location places lined up, but sometimes, you know, we
19  recommend you get a sponsor, a person could help you transition if
    someday you were to get a parole date.  And the one I always
20  throw out there just because I can, um, is to think about upgrading
    educationally.  If you have an opportunity to take some
21  correspondence courses or a college class here and there.  Too
    much education certainly won't hurt you . . . .
22
    You might want to have records check the county of residence of
23  the victim to see if that's applicable to his parole plans . . . .

24  Maybe last legal residence would be the best place for parole.  I'd
    like to re-state the obvious and how much weight the
25  Commissioner and I gave your programming, how well you're
    programming, and that's why we feel that it would be feasible for
26  another Panel to consider you within a one-year timeframe, even

13

though you have a serious 115, and any time you have negotiable
contraband, it's very serious, whether that be marijuana or weapon
stock.  Obviously, a weapon that's already done is different, but
somethin' that's readily negotiable is very serious.  It leads to
violence in a prison setting, so we take that 115 seriously.  So with
that stated, we both feel that you seriously would be considered for
parole within a one-year timeframe because your programming is
so good.  So, I wanted to re-state, she already mentioned that, and I
wanted to restate that.  So keep doin' what you're doin'.  You're
doing very well.

(Pet'r's Pet., Ex. D at p. 97-108.)

B.  Superior Court Decision

On March 7, 2008, the County of El Dorado Superior Court denied Petitioner's state

habeas petition.  In denying the petition, that court stated the following:

In reviewing the claims in the current petition for habeas corpus
relief, the Court applies the "some evidence standard.  The decision
to deny parole must be supported by "some evidence" in the record
(see People v. Powell (1988) 45 Cal.3d 894, 902; In re Ramirez
(2001) 94 Cal.App.4th 549, 563; In re Rosenkrantz (2000) 80
Cal.App.4th 409, 423).  Under this standard, the decision will be
upheld as long as there is "some basis in fact" for the decision
(Powell, supra, at p. 904; Ramirez, supra, at p. 563).

The record shows that the parole board decided that petitioner still
posed an unreasonable risk of danger to society for the following
reasons:  (1) the serious nature of the crime that "destroyed a man's
life;" (2) a serious drug abuse history; (3) a long criminal history;
(4) failure on probation; (5) failure on diversion; (6) one CDC
disciplinary citation; (7) concern that he might regress and return to
his previous hatred toward law enforcement; (8) his need to "shore
up"his support system should he be released; and (9) the opposition
to his parole by the Sheriff and District Attorney.  These findings
are supported by ample evidence in the record.  The board also
took into account all of the circumstances in mitigation and
afforded petitioner due process of law.  Accordingly, the petition
for writ of habeas corpus is denied.

(Resp't's Answer, Ex. 1 at p. 2-3.)

C.  Analysis of Petitioner's Claim

In this case, the state court cited to some evidence beyond the circumstances of the

commitment offense which supported the finding that Petitioner was currently dangerous.  As

1    previously stated, the question is whether there is something in Petitioner's pre or post-

2    incarceration history or his current demeanor or mental state that supports the inference of

3    current dangerousness.  See Hayward, 603 F.3d at 562.

4         The record supports that there was "some evidence" to support the inference of

5    Petitioner's current dangerousness beyond the circumstances of the commitment offense.  At the

6    outset, the record supported the Board's findings that the commitment offense was carried out in

7    a cruel and callous manner and demonstrated a disregard for human suffering and that the motive

8    was inexplicable.  See 15 Cal. Code Regs. § 2402(c)(1)(D)-(E).  Additionally, the Board and

9    state court relied on several additional factors beyond the circumstances of the commitment

10   offense in denying Petitioner parole due to his current dangerousness.  For example, Petitioner

11   received a 115 disciplinary infraction in February 2007, only eight months prior to his parole

12   suitability hearing.  See 15 Cal. Code Regs. § 2402(c)(6).  The 115 disciplinary infraction was for

13   possession contraband in the form of cigarettes.  See 15 Cal. Code Regs. § 3312(a)(3)("When

14   misconduct is believed to be a violation of law or is *not minor* in nature, it shall be reported on a

15   CDC Form 115.") (emphasis added).  Petitioner's extensive prior criminal history was also

16   noted.  See, e.g., id. § 2402(c)(2).  Petitioner's prior crimes included convictions for burglary,

17   drug offenses and the violent offense of battery against his sister.  In fact, Petitioner was on

18   probation at the time he committed the commitment offense.  These factors created a nexus to

19   support the Board's finding of Petitioner's current dangerousness.

20        In light of this record, it cannot be said that the state court determination that there was

21   some evidence supporting the Board's finding that Petitioner posed a risk of danger to the public

22   "resulted in a decision that was contrary to, or involved an unreasonable application of clearly

23   established Federal law" or "resulted in a decision that was based on an unreasonable

24   determination of the facts in light of the evidence presented."  28 U.S.C. § 2254(d).  There was a

25   modicum of evidence in the record that supported the Board's ultimate determination that

26   Petitioner posed a current risk of danger to society such that Petitioner's constitutional rights

were not violated by the denial of his parole.  "This court cannot reweigh the evidence, but looks only to see if 'some evidence' supports the [Board's] decision."  Powell v. Gomez, 33 F.3d 39, 42 (9th Cir. 1994).  The minimally stringent "some evidence" standard was met in this case.[4] Therefore, Petitioner is not entitled to federal habeas relief.

V.  PETITIONER'S REQUESTS

A.  Request for an Order to Show Cause

Petitioner requests an order to show cause why habeas relief should not be granted.  (See Pet'r's Pet. at p. 24.)  Respondent answered the petition on June 21, 2010.  Accordingly, Petitioner's request for an order to show cause is denied as moot.

B.  Request for the Appointment of Counsel

Petitioner also requests the appointment of counsel.  There currently exists no absolute right to the appointment of counsel in habeas proceedings.  See, e.g., Nevius v. Sumner, 105 F.3d 453, 460 (9th Cir. 1996).  However, 18 U.S.C. § 3006A authorizes the appointment of counsel at any stage of the case "if the interests of justice so require."  In the present case, the interests of justice do not so require to warrant the appointment of counsel.  Accordingly, Petitioner's request for the appointment of counsel is denied.

//

//

---

[4]  The Superior Court also cited to a concern regarding Petitioner's previous hatred towards law enforcement and his need to shore up his support system as additional "some evidence" that Petitioner continues to be an unreasonable risk of danger to society.  In light of the fact that the other reasons cited by the Superior Court (and the Board) are supported in the record as discussed supra, these factors will be not be addressed.  Cf. Biggs v. Terhune, 334 F.3d 910, 915-16 (9th Cir. 2003) (finding that even where many of the Board's conclusions and factors relied upon were devoid of an evidentiary basis, the petitioner was still not entitled to federal habeas relief because there was other "some evidence" which did not entitle petitioner to federal habeas relief at that time) overruled on other grounds, Hayward, 603 F.3d 546; In re Cerny, 178 Cal. App. 4th 1303, 1310-16, 101 Cal. Rptr. 3d 2000 (2009) (denying state habeas petition where Board's decision to deny parole included many factors that were unsupportable, but also included the factor that petitioner was without verifiable parole plans such that the Board found that petitioner might revert to prior drug use).

VI.  CONCLUSION

For all of the foregoing reasons, IT IS HEREBY ORDERED that:

1.      The Clerk of Court is directed to randomly assign a district judge to this matter;

2.      Petitioner's request for an order to show cause is DENIED AS MOOT; and

3.      Petitioner's request for the appointment of counsel is DENIED.

Furthermore, IT IS RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  December 9, 2010

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE

17